## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 25-cr-173 (RBW)** |
| **DEVONNE BROWN,** | |
| **Defendant.** | |

## MOTION FOR REVIEW AND APPEAL OF RELEASE ORDER

The United States of America, by and through its undersigned counsel, respectfully appeals, and seeks this Court's review of, the magistrate court's June 13, 2025, Order denying its motion for pretrial detention. The magistrate court stayed its release order pending this appeal.

Defendant Devonne Brown poses an unmitigable risk to community safety and should be detained pending trial. Brown, a fifty-six-year-old resident of the District of Columbia, met Minor Victim 1 ("MV-1") in early 2024, when she was 13 years old, and sexually exploited her for more than a year. Throughout that period, the defendant repeatedly communicated with the victim on-line and directed MV-1 to produce and send him videos of herself engaged in sexually explicit conduct, in exchange for money. On May 30, 2025, the defendant was charged in a Criminal Complaint with Receipt of Child Pornography in violation of 18 U.S.C. § 2252(a)(2), for an offense occurring on or about April 21, 2024. Subsequently, on June 12, 2025, the Defendant was indicted by a Grand Jury sitting in the District of Columbia, in a single count indictment charging him with Sexual Exploitation of a Minor, in violation of 18 U.S.C. § 2251(a), for sexual exploitation of MV-1 occurring from February 18, 2024, until March 29, 2025.

The government sought pretrial detention of the defendant pursuant to 18 U.S.C. §§ 3142(e)(3)(E) (rebuttable presumption in favor of detention), and 3142(f)(1)(A) (crime of violence)

because there is no condition or combination of conditions of release that will reasonably assure the safety of any person or the community.

The magistrate court held a detention hearing on June 4, 2025. At the June 4 hearing, the court heard testimony from the defendant's 79-year-old mother, Judith Woody, who was proposed by the defense as a third-party custodian. After hearing Ms. Woody's testimony, the magistrate court alluded to *United States v. Willis*, No, 22-MJ-122—a child sexual exploitation case in which then–Chief Judge Howell had affirmed its release conditions on appeal after the defense had presented an extremely stringent third-party custodian plan, which included 24-hour-a-day supervision of the defendant by his two parents in their single family home in Michigan. Because the defendant in *Willis* had different life circumstances that do not exist here, the defense tried to replicate those conditions by modifying its proposed third-party custodian plan.

The detention hearing was continued until Friday June 13, 2025. During the second detention hearing, the court heard testimony from the defendant's adult sister, Michelle Woody Williams, who was proposed by the defense as a back-up third-party custodian who offered to assist in the supervision of her brother during times when Ms. Woody is unavailable or otherwise unable to supervise her son.

The magistrate court concluded that the modified third-party custodian plan would adequately mitigate the risk to the community posed by the defendant if he were to be released and reasoned that the circumstances were like those approved by the court in *Willis*. The court ordered the defendant released but granted the government's oral motion for a stay pending appeal.

The magistrate court erred by not adequately considering the Section 3142(g) factors as they apply in this case, including the nature and circumstances of the charged child sexual exploitation offense and the nature and seriousness of the danger to any person or the community. It instead relied on a strained comparison to *Willis* which involved entirely online conduct occurring over the course

of approximately one week, a defendant with no prior history of sexual misconduct. No case cited by the magistrate court involves a defendant who targeted and approached a 13-year-old girl on the street, groomed and sexually exploited her repeatedly on-line for more than a year, and then pressured the victim to meet him in person. Moreover, no case cited by the magistrate court involved a defendant with a prior history of sexual misconduct.

The magistrate court's proposed release conditions are facially inadequate to assure community safety, and their viability—even in the short-term—is questionable. The proposed conditions would place upon an elderly, infirm woman who was deemed ineligible by Pretrial Services to serve as third-party custodian due to her mental and physical health problems, the responsibility for acting as her son's jailer 24-hours of day, with back-up help available only on an ad hoc basis from her adult daughter who lives in a separate household. For reasons that follow, this Court should reverse the magistrate court's release order and detain the defendant pending trial.

## **BACKGROUND**

On November 7, 2024, an employee of Block Inc. reported a suspicion of child exploitation to the National Center for Missing and Exploited Children (NCMEC) which was occurring on CashApp. The employee reported that a suspected adult's CashApp account had been reported for "grooming minors & purchasing child sexual abuse materials ("CSAM"). CashApp identified three accounts of suspected minors and reported that the adult's account had the display name "C_0se2e1msa." The CashApp employee reported that the adult's account is registered with a name of Devonne Brown, a phone number ending in -5035, an email address of devonne757@gmail.com, with a display name of "Project Impact Sports."

The employee provided the following statement regarding the suspected adult's activity (Minor Victims' names removed from the statement):

      A review was prompted by an internal referral which identified possible OCSE

activity. Most of the money transfers identified in the accounts consisted of linear movement of funds sent from the subject to the minors. For example, on June 22, 2024, 2:31 AM (EST) Brown sent a $120.00 payment to Minor Victim #2 with the comment "donations light bill".  Additional payment comments were examined and found to contain notations such as "lunch donation", "dinner", "lunch , gonna text u", "lunch costed extra", "hope its not too much , if it is send what u can", "donation", and "breakfast , text me on instagram message wont work". These payment comments could be indicative of grooming as sexual grooming is the action or behavior used to establish an emotional connection with a minor under the age of consent, to lower the child's inhibitions with the objective of sexual abuse. On September 20, 2024, at 9:06 PM (EST), Minor Victim #1[1] sent a payment request of $10 with the comment "********* on instagram!! text me". Additionally, on April 21, 2024, at 7:41 PM (EST), Minor Victim #2 sent a payment request of $15 to Brown with the comment "for snacks ? more photos otw ." suggesting Minor Victim #2 previously sent CSAM to the subject. The payment patterns combined with the inability to establish a legitimate relationship between Brown and the minors suggests that Brown was grooming the minors. Therefore, the activity is and indication the adult is grooming the minor and purchasing CSAM via the internet.

On January 23, 2025, a member of the MPD-FBI Child Exploitation and Human Trafficking Task Force ("CEHTTF") conducted a records search of commercial, open source, and law enforcement only databases to identify the reported adult CashApp account.  The member subsequently identified the defendant, Devonne Keith Brown as the likely user.  Before his arrest, Brown was employed by IDEA Public Charter School as a health and physical education teacher and track coach.  Brown is also affiliated with a youth track club called, "Project Impact Sports," and he has been employed by several different schools in the Washington D.C. area for many years.

A member of CEHTTF viewed the contents of MV-1's CashApp account and found that there were 36 transactions between MV-1's account and the defendant's CashApp account.  The transactions began on February 18, 2024, and ended on September 22, 2024.  The transactions were typically between $10 to $35 and had notes linked to them which included the following:

    a.   check gmail

---

[1] Minor Victim #1 ("MV-1") is currently 15-years-old but was 13-years-old when she met the defendant.

b. for snacks? ☐ more photos otw.

c. food, phone broke text on gmail

d. lunch donation

e. hmu on my number XXX XXX 5035 (*redaction added*)

f. IG Project Impact Sports

During an interview with members of the CEHTTF, MV-1 reported that she had communicated with a person who called himself "Joseph." MV-1 initially stated that "Joseph" was a same age minor. MV-1 later reported that "Joseph" was an adult male whom she had met near a Giant grocery store by her home. MV-1 further stated that "Joseph" had asked her to buy him ice cream and had sent her money on CashApp. MV-1 stated that she met this adult male for the first time at the Giant and then she communicated with him via Instagram and iMessage. MV-1 disclosed that she sent the adult male nude photographs of herself in these conversations. MV-1 gave members of CEHTTF an Apple iPhone that she had used during the time that she was communicating with the defendant. A forensic image of the Apple iPhone was extracted, and a report was generated for review.

On May 8, 2025, MV-1 was interviewed at Safe Shores located at the Child Advocacy Center in D.C. MV-1 disclosed that she had met an adult male at Giant near her home. The adult male had asked her to buy ice cream for him and asked for her CashApp account. MV-1 provided her CashApp to the adult male and bought ice cream for him. MV-1 reported that shortly after this she began communicating with the man via iMessage and after approximately a week he started asking her for sexual content.

MV-1 reported that the adult male would send her pictures of nude women and ask MV-1 to recreate the image for him. The adult male also requested videos of her "boobs, butt, and vagina" by

sending specific emojis to her.  MV-1 disclosed that the adult male had sent a photograph of his penis to her. MV-1 stated that she would send videos to the man, and he would send money to her. MV-1 reported that the man became "weird" when he would tell her he was near her and wanted to link up. MV-1 stated that she stopped communicating with him after that happened.

MV-1 was shown an example of the suspected CashApp transactions between herself and the defendant.  MV-1 explained that these were the transactions what she was talking about and identified an emoji on the transaction that was a request for a photograph of her breast.  MV-1 also stated that the man's Instagram page was "Project Impact Sports" and believed that the telephone number on the transaction, ending in -5035, was the number of the adult man to whom she had sent sexual videos.

A member of the CEHTTF reviewed the contents of the Apple iPhone used by MV-1 to communicate with the defendant.  The member found that the Apple iPhone had been linked to an Apple iCloud using the email address xxxxxyanaa@gmail.com. The member found that the telephone number ending in -5035 had been blocked on the phone.  The member also located a message from the phone number ending in -5035 to the Apple iPhone which stated, "Videos for money?" sent on April 25, 2025, at approximately 12:25 am.

The member also located 11 emails from Cash@square.com to an email used on the cellular phone between September 13, 2024, and September 21. 2024.  The emails showed CashApp interactions with the CashApp user, "Project Impact Sports" / $Wissey.  Two of the notifications stated, "hmu on my number XXX XXX 5035" (*redaction added*) and "for breakfast, text me on Instagram message won't work."

On May 14, 2025, a CEHTTF member presented an affidavit in support of a search warrant for the Google account of Devonne757@gmail.com to United States District Court of the District of Columbia (USDC DC) Magistrate Judge Michael Harvey.  USDC Magistrate Judge Harvey reviewed

the affidavit and authorized a search of the account (25-SC-801). Google was served with the authorized search warrant on May 15, 2025.

On May 20, 2025, a CEHTTF member reviewed the contents of the account and located numerous selfie style photographs of the defendant throughout the account. In addition, the account contained a contact named "Yana Ice Cream 🍦🍨 Shop" with a phone number ending in -5112. The contact also appeared to have a photograph of MV-1 assigned to the contact card. A CEHTTF member reviewed the email content of the Google account Devonne757@gmail.com and located twenty-two emails from YanaXXXXXXX@gmail.com to Devonne757@gmail.com from April 21, 2024, to July 15, 2024, and seven emails from xxxxxyanaa @gmail.com to Devonne757@gmail.com from September 23, 2024 to March 29, 2025.

On April 21, 2024, at 10:54 pm an email from YanaXXXXXXX@gmail.com to Devonne757@gmail.com contained five video files. A member of CEHTTF reviewed all the files and found that they were close-up recordings of a female penetrating, manipulating, and opening her vagina with her fingers to masturbate.

On April 21, 2024, at 11:09 pm, an email had been sent from YanaXXXXXXX@gmail.com to Devonne757@gmail.com which contained two video files. The first file depicted a female wearing a black shirt with a silver in color butterfly necklace lifting their shirt to expose their breast to the camera. The second video depicted a close-up recording of a female penetrating her genitals with her fingers. On April 21, 2024, at 11:10 pm, an email was sent from YanaXXXXXXX@gmail.com to Devonne757@gmail.com which contained three video files. All three video files depicted a female penetrating her genitals with her fingers while masturbating.

On May 4, 2024, at 4:23 pm, an email was sent from YanaXXXXXXX@gmail.com to Devonne757@gmail.com which contained one video file. The file was reviewed and displayed the body of a completely nude female wearing jewelry around her abdomen, a red bracelet, and a silver

in color butterfly necklace.  The female appears to be in a bathroom and is observed penetrating her genitals with her fingers.

On May 4, 2024, at 4:27 pm, an email was sent from YanaXXXXXX@gmail.com to Devonne757@gmail.com which contained one video file.  The file displayed the body of a completely nude female wearing a jewelry around her abdomen, a red bracelet, and a silver in color butterfly necklace.  The female exposes her buttocks to the camera and penetrates her vagina with her fingers.  The female's face is partially visible in the video and resembles MV-1.

On May 4, 2024, at 4:30 pm, an email was sent from YanaXXXXXXX@gmail.com to Devonne757@gmail.com which contained one video file.  The file depicted the body of a completely nude female wearing a jewelry around her abdomen, a red bracelet, and a silver in color butterfly necklace.  The female appears to be in a bathroom and is observed penetrating her genitals with her fingers.  The female's face is partially visible in the video and resembles MV-1.

A CEHTTF member reviewed the CashApp logs for MV-1 and found that the defendant had sent money to MV-1 with the following notes:

    g.  4/21/2024 @ 6:20 pm:  $32.62 "hope its not too much , if it is send what u can."

    h.  4/21/2024 @ 6:41 pm:  $15.00 "for snacks ? □ more photos otw ."

    i.  5/4/2024 @ 6:36 pm:  $25.00 "Dinner"

A CEHTTF member reviewed the IP logs of Devonne757@gmail.com and found that the account had been logged into on May 4, 2024, at 5:27 pm, from the IP address of 173.73.209.88, which is the IP address that is currently registered to the defendant at his home in Washington, D.C. A CEHTTF member reviewed the rest of the emails between MV-1 from her YanaXXXXXXX@gmail.com account and the defendant at his Devonne757@gmail.com account

and found that seventeen of the other emails contained videos of a female engaged in sexual acts, sexual contacts, and/or lewd/lascivious displays of her genitals.

On March 28, 2025, at 9:46 pm, an email was sent from MV-1 at her xxxxxyanaa @gmail.com email account to the defendant at his Devonne757@gmail.com account, which contained one video file. The file depicted a completely nude female wearing a silver in color heart necklace sitting on the floor of a bathroom. The female is penetrating her genitals with her fingers and touches her breasts during the video.

On May 23, 2025, MV-1 met with a member of CEHTTF and looked at screenshots of the silver heart necklace, silver butterfly necklace, and the partially visible female face from the content distributed to the defendant at his Devonne757@gmail.com account. MV-1 reported that the jewelry belonged to her and that the partially visible female's face was hers.

The defendant was arrested on June 2, 2025, pursuant to a Criminal Complaint charging him with Receipt of Child Pornography, in violation and Arrest Warrant issued out of District of Columbia on May 30, 2025. (ECF No. 1). After his arrest, the defendant waived his *Miranda* rights and gave a voluntary interview with the CEHTTF. During the interview, the defendant admitted that he sent money via CashApp to students that he knew from the school where he worked. The defendant further admitted that he gave money via CashApp to MV-1. The defendant claimed that he did not know MV-1's age, but he admitted that he received sexual videos from her. The defendant explained that he sometimes pays for sexually explicit videos from "strippers." The defendant admitted that he met MV-1 somewhere in Maryland.

The defendant provided CEHTTF the passcode to his cellular phone. Review of the phone is on-going at the time of this filing, but the agents did find text messages between the defendant and MV-1 occurring between March 28, 2025 and April 24, 2025, during which the defendant directed the victim to sent him sexually explicit videos and repeatedly pressured her to meet in person to

receive cash, rather than the electronic funds transfers that he had sent her for sexual videos in the past. Their chat included the following exchange on March 28, 2025 (the same day that the defendant had received a sexually explicit video from the victim via Gmail, which is described above):

Defendant: Show everything without playing wit dat kitty

MV-1: Like record my whole body without doing anything right?

Defendant: Yeah

Defendant: Back and front

Defendant: That thing phat

MV-1: Sent

MV-1: Did you get it?

Defendant: I'm in your area now

MV-1: Oh

MV-1: U still selling it?

Defendant: Do you want cash in hand?

MV-1: I want it on zelle

On April 5, 2025, the victim texted the defendant that she needed to get her hair and nails done and the defendant offered to take her. The victim declined and said that she wanted to go with her girls. The defendant persisted and said that he would drop her off. After the victim said that the nail salon was across the street from her, the defendant responded, "that's even better. I'll bring you the money." The victim and the defendant then discussed meeting the next day at the Giant or the "old Macy's." The victim declined to meet the defendant, and the following exchange occurred:

MV-1: "can u zelle the money?"

Defendant: No

MV-1: Why?

Defendant: You can come get it

MV-1: I don't wanna see nobody with my hair and nails not done

Defendant: Ok. Enjoy your day.

MV-1: Ur not gonna give me it cause i don't want link? Lol

MV-1 Videos for money?

Defendant: I have cash

Shortly following this exchange, the victim indicated that she blocked the defendant.

## PROCEDURAL HISTORY

The defendant was arrested on June 2, 2025, and made his initial appearance before the magistrate court on the same day. On the government's motion, the defendant was held pending a detention hearing scheduled for June 4, 2025. On June 3, 2025, the government filed a memorandum in support of its motion for pretrial detention. (ECF No. 8). The defense did not submit any filing or proposed release plan.

Prior to the initial detention hearing, Pretrial Services determined that the defendant's 79-year-old mother, Judith Woody, was ineligible to serve as third-party custodian due to her physical and mental conditions. Nevertheless, Ms. Woody testified at the detention hearing that she would be willing to serve as a third-party custodian should her son be released. She testified that she lives in a two-bedroom townhome in Chesapeake, Virginia. *See* ECF no. 9 at 15, 22. There are children living down the street from Ms. Woody's townhome and there are two schools nearby. *Id.* at 30-31. At home, Ms. Woody receives daily care from a nurse who helps her with daily tasks including washing herself, paying bills, taking medications, and transportation to medical appointments. *Id.* at 15, 23-24. Ms. Woody estimates that she spends 85-89 percent of her time at home, but leaves the house daily to take hour-long walks, and leaves to go to the grocery store and medical appointments. *Id.* at 22-23, 27-29. Ms. Woody generally wakes at 6:00 a.m. and is asleep by 10:30 p.m. *Id.* at 27-

29. Ms. Woody has internet television at home and uses a smart phone. *Id.* at 27. Ms. Woody indicated that she is not familiar with technology and characterized her knowledge as "zero minus." *Id*. at 26.

On June 13, 2025, the parties appeared for a second detention hearing. At the second hearing, the defendant's adult sister, Michelle Wood Williams testified that she would be willing to come to the home of her mother, Ms. Woody, and provide supervision of the defendant when Ms. Woody is unavailable or unable to supervise the defendant. (ECF No. 10 at 9, 12). She testified that she lives approximately 15 minutes away from her mother and that she could be at her mother's home when needed with only 10 minutes notice. *Id.* at 18. She testified that she would be willing to search her mother's home to ensure that the defendant was not hiding electronic devices or otherwise violating his conditions of release. *Id.* at 24-25. She further testified that she was not aware of complaints about the defendant's behavior from students or others at the high schools where the defendant has worked as a teacher or youth athletic coach. *Id*. at 22. She testified that she was not aware of allegations from one of the defendant's ex-wives that the defendant had inappropriately touched a child in their household. *Id.* at 23. Despite having no knowledge of the defendant's past inappropriate behaviors with minors, she testified that she would turn in the defendant if she caught him violating his conditions of release. *Id.* at 12-13.

At both hearings, the government argued that based on the Section 3142(g), including the nature and circumstances of the charged child sexual exploitation offense and the nature and seriousness of the danger posed by the defendant, there were no combination of conditions of release that could adequately assure the safety of the community. *See* ECF No. 8, 9, 10. The government further argued that the release conditions in *Willis* were different that in the present case for several reasons. First, *Willis* had proposed two full-time custodians—his retired parents—who reside together in a home they owned for over thirty years. Those conditions are much more stable than the

proposed conditions here, which would require the defendant's mother to supervise the defendant on her own, with back-up help from the defendant's adult sister.   Second, the defendant in *Willis* was confined in a single-family home with no minors nearby, while the supervision plan in this case would have the defendant living in his mother's townhome community, where minors also reside, and where schools are located nearby.

The government further argued that the defendant's mother and sister, while undoubtedly well intentioned, lack the necessary experience and training to supervise the defendant and would not be appropriate third-party custodians.  The magistrate court rejected these arguments and ordered the defendant released.  The government orally moved for a stay pending appeal, which the court granted.

On June 13, 2025, this Court set a hearing on the government's appeal for June 16, 2025, and issued a briefing schedule.  The government now respectfully submits this Motion for Review.

## **LEGAL STANDARD**

Title 18, United States Code, Section 3145(a) provides:

(a) **Review of a release order** - If a person is ordered released by a magistrate, . . .

(1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the magistrate court's denial of pretrial detention.  Although the D.C. Circuit "ha[s] not squarely decided the issue," *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021), every other circuit to have analyzed the issue has concluded the standard is *de novo*.  *See United States v. Blackson*, No. 23-CR-25, 2023 WL 1778194, at *5 & n.2 (D.D.C. Feb. 6, 2023), *aff'd,* No. 23-3020, 2023 WL

2663034 (D.C. Cir. Mar. 28, 2023) (citing decisions from the First, Second, Third, Fourth, Fifth, Eighth, Ninth, and Tenth Circuits that stand for this proposition).

In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not raised previously. In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community," the Court shall order the defendant held pending trial. 18 U.S.C. § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). As a threshold matter, the government must demonstrate by a preponderance of the evidence that a defendant is a flight risk, *see United States v. Anderson*, 177 F. Supp. 3d 458, 466 (D.D.C. 2016) (citing *United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir. 1996)), and by clear and convincing evidence that he is a danger to the community, *see* 18 U.S.C. § 3142(f).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

Here, Congress has specified that for an offense involving a minor victim under Section 2423, "[s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of

14

conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(E).  This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption."  *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released").  But even if the defense produces credible evidence, the presumption retains evidentiary weight and is considered by the Court among the Section 3142(g) factors.  *See, e.g.*, *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("Even when a defendant satisfies his burden of production, however, 'the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court.' . . . The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001))); *United States v. Ali*, 793 F. Supp. 2d 386, 388 n. 2 (D.D.C. 2011) ("[C]ircuits that have considered the issue require using the presumption as a factor even after the defendant has produced credible evidence.").

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."  18 U.S.C. § 3142(f).  Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer.  *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use."  *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992).  A

pretrial detention hearing should not be used as a discovery device.  *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

## ARGUMENT

For reasons that follow, the defendant poses an unmitigable risk to community safety. Because there are no conditions of release adequate to reasonably assure community safety, this Court should reverse the magistrate court's release order and detain the defendant pending trial.

### I.    The Statutory Factors All Weigh Heavily in Favor of Detention.

### A.    Nature and Circumstances of the Charged Offense

The nature and circumstances of the charged offense weigh heavily in favor of detention.  The Defendant's alleged conduct in this case is extremely harmful and dangerous to the community, as it involves the targeting, grooming, and sexual exploitation of a vulnerable minor victim.  "Child pornography depicts pictorial evidence of physical sex abuse against, and exploitation of children and the production and distribution of such contraband carries a multitude of harms."  *United States v. Galarza*, No. 18-MJ-146 (RMM), 2019 WL 2028710, at *6 (D.D.C. May 8, 2019) (Howell, C.J.) (reversing magistrate court's release order); *United States v. Nickelson*, No. 18-MJ-102 (GMH), 2018 WL 4964506 (D.D.C. Oct. 15, 2018) (Howell, C.J.(same); *United States v. Blanchard*, No. 18-MJ-101 (GMH), 2018 WL 4964505, at *4 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same).  Children captured in images and videos depicting their sexual abuse are significantly harmed at the time that the images and videos are created, and they are re-victimized and re-traumatized every time an individual, such as the Defendant, views these images for his own sexual gratification and for the sexual gratification of others. *See Galarza*, 2019 WL 2028710, at *6.

The defendant's conduct in this case was extremely serious. The evidence here shows that the defendant not only received several CSAM videos depicting the minor victim, but he also engaged in repeated on-line communications with the victim during which he asked the victim to

produce the CSAM material for him, often in exchange for money.  The evidence further shows that the defendant targeted the victim when he encountered her in person at a grocery store parking lot when she was 13years old, and he began to groom her, and then sexually exploited her – directing her to produce child pornography videos for him in exchange for money—for over a year.  Finally, the defendant pressured the victim to meet him again in person, after he had habituated her to his on-line sexual exploitation, and it was only then that the victim blocked him.

Here, the charged offense both **(i)** is a crime of violence that serves as the basis for the statutory presumption of dangerousness and **(ii)** involves a minor victim.  The Court is required to consider both of these factors in assessing the nature and circumstances of the offense.  *See* 18 U.S.C. § 3142(g)(1) ("The judicial officer shall . . . take into account the available information concerning— the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a minor victim . . . ."); *Breeden*, 2015 WL 13310427, at *7 ("Congress specifically directed courts to consider whether a defendant is charged with a 'crime of violence' when assessing the nature and circumstances of the offense factor, and it designated a violation of section 2423(b) to be a crime of violence."); *accord United States v. Johnston*, No. 17-MJ-46, 2017 WL 4326390, at *4 (D.D.C. Sept. 28, 2017) (Howell, C.J.) (noting that a violation of Section 2423(b) "is a serious crime" subject to a rebuttable presumption of detention); *United States v. Beauchamp-Perez*, 822 F. Supp. 2d 7, 10 (D.D.C. 2011) ("With respect to the nature and circumstances of the offense, the charged offense is serious and involved traveling with intent to have sex with a twelve year-old minor victim.  The Court finds that this factor supports detaining the defendant; indeed, it is the basis for the presumption in favor of detention.") (Bates, J.).

The seriousness of the charged offense is also reflected by Congress's judgment that those charged with producing child pornography should be presumed detained pending trial, *see* 18 U.S.C.§ 3142(e)(3)(E) and are subject to a fifteen-year mandatory minimum term of imprisonment

upon conviction. *See* 18 U.S.C. § 2251(a)(1). Accordingly, the nature and circumstances of the defendant's offense weigh heavily in favor of detention.

### B. <u>The Weight of the Evidence Against the Defendant</u>

The second factor to be considered, the weight of the evidence, also weighs heavily in favor of detention. The evidence against the defendant is strong. As detailed above, the defendant received child pornography from MV-1 on multiple occasions and he was repeatedly in communication with her over the course of several weeks as he directed her to produce CSAM videos for him, often in exchange for money. The evidence includes the minor victim's statement, as well as CashApp transactions and email communications between the defendant and MV-1. In addition, the defendant admitted during his post-arrest custodial interview with law enforcement that he had received sexually explicit images and videos from MV-1, although he denied knowing that she was a minor. In light of the defendant's decades of experience interacting with teenagers, while he worked as a teacher and youth athletics coach, it is difficult to believe that he did not know that MV-1 was a minor. The defendant admitted that he met MV-1 in person before he began communicating with her and paying her to produce and send CSAM to him. Certainly, a teacher and youth athletic coach who has spent years working with teens would have been able to tell that MV-1, who as 13 years old when she met the defendant, was a minor.

While some judges in this Court have indicated that this factor should be given less weight, in *United States v. Blackson*, following a thorough review of the text of Section 3142 and decisions analyzing this factor, then–Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." No. 23-CR-25 (BAH), 2023 WL 1778194, at *8 (D.D.C. Feb. 6, 2023) (Howell, C.J.). Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at

*10.  In an unpublished opinion, the D.C. Circuit affirmed then–Chief Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023).  The Second Circuit reached the same decision after a thorough and careful analysis of the issue.  *United States v. Zhe Zhang*, 55 F.4th 141, 149–150 (2d Cir. 2022).  This Court should follow *Blackson* and *Zhang*; this factor should be given no less weight than any other factor.

Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 WL 1778194, at *10.  This is such a case, and the Defendant should be detained pending trial.

### C.  The History and Characteristics of the Defendant

Although the defendant has no known criminal convictions, the pretrial report reflects that he has been arrested seven times.  (ECF No. 6).  In addition, his conduct in this case was extremely serious and reflects a persistent interest in the sexual exploitation of minors. The defendant not only targeted and communicated with a vulnerable minor victim on-line and repeatedly received child pornography produced by this child, but he also directed the victim to produce the material and paid her to produce the material for him. In addition, the CyberTip that was sent to NCEMC about the defendant's CashApp account identified suspicious financial transactions between the defendant and two other suspected minors.  Also, the defendant's employment history reflects a troubling pattern of moving from one school or youth program to another over short periods of time and being fired from his employment after engaging in inappropriate sexual behavior with others at the workplace. This factor also weighs in favor of detention.

### D.    The Nature and Seriousness of the Danger to any Person or the Community

The facts and evidence in this case establish that the defendant poses a grave danger to the community. The defendant here was engaged in prolonged grooming and sexual exploitation of a 13-year-old girl that he targeted when he encountered her in a grocery store parking lot. He sexually exploited her for over a year, and did so while employed as a physical education teacher and athletic coach at a high school in Washington, D.C. Beyond the egregious and harmful conduct of the instant offense, the fact that the defendant engaged in this conduct while employed as a teacher is particularly troubling. The choice that the defendant has made to pursue a career that brings him into close contact with minors makes him particularly dangerous because has consistently chosen to be with this vulnerable group of individuals who he appears to find sexually attractive, even while engaging in the prolonged sexual exploitation of at least one very young teen girl.

As discussed above, the production and receipt of child pornography results in severe mental, emotional, and physical trauma to the minors who are victimized by offenders such as the defendant, who seek to achieve sexual gratification by sexually exploiting these children. It is precisely "[t]hese significant harms and dangers [that] animated the Congress to create the statutory presumption of detention in these cases." *Galarza*, 2019 WL 2028710, at *7; *Nickelson*, 2018 WL 4964506, at *5 (noting also Congress's creation of significant statutory mandatory minimum penalties); *Blanchard*, 2018 WL 4964505, at *4 (same). The totality of his conduct demonstrates that he poses an unmitigable danger to the community. There is no condition or combination of conditions that could reasonably assure community safety were the defendant to be released. This Court should order that he remain detained pending trial.

Although the defendant appears to have minimal criminal history, the absence of prior criminal history is not sufficient to rebut the statutory presumption of dangerousness on the facts of this case. *See, e.g. Breeden*, 2015 WL 13310427, at *7 ("But the inferences the defendant is asking the Court to draw do not go far enough. The Court is not certain that a lack of *more* incriminating

evidence constitutes 'evidence' that rebuts the presumption arising from the undisputed facts of the case." (emphasis in original)); *Pope v. United States*, 739 A.2d 819, 826 (D.C. 1999) (explaining that, under the D.C. Code's rebuttable presumption, if a court makes the requisite finding that a defendant committed certain crimes, then the "defendant is presumed to be dangerous (and subject to preventive detention) even if his prior record is clean and if no other showing of dangerousness is made").

Accordingly, this factor also weighs strongly in favor of detention.

**II.    The Magistrate Court's Release Order Should be Reversed.**

The magistrate court's release order should be reversed.  The magistrate court's proposed release conditions rely on a strained comparison to a factually dissimilar case and are inadequate to protect the community from this defendant.  And more generally, a third-party custodian cannot reasonably assure community safety here.

   **A. The Magistrate Court Erred in Failing to Adequately Consider the Nature and Circumstances of the Offense and Nature and Seriousness of Danger Posed by the Defendant and it's Proposed Release Conditions Are Inadequate to Protect the Community from this Defendant.**

From the outset of the proceedings, the magistrate court suggested it would entertain release on conditions like those in *United States v. Willis*, a case in which then–Chief Judge Howell had previously affirmed its release of someone charged with a child sexual exploitation offense.  Because those conditions do not exist in this case, the magistrate court gave the defendant two opportunities over the course of a month to try to bring them about.

The magistrate court erred because this case is distinguishable from *Willis*, both in terms of the defendant's alleged criminal conduct and the potential viability of the proposed release conditions.  In *Willis*, the defendant communicated with a 14-year-old girl online and sought to entice her to have sex with him.  While the defendant's conduct certainly was serious, it occurred entirely

on-line and over a short period of time.  The defendant in this case, on the other hand, targeted a 13-year-old girl that he met a grocery store parking lot and then groomed her, sexually exploited her on-line for over year, and then pressured her to meet him in person.  The magistrate court erred here in not fully considering the nature and circumstances of *this* case and the nature and seriousness of the danger posed by this defendant, and the meaningful ways in which this case differs from *Willis*.  The magistrate court improperly characterized the danger posed by the defendant's release as the risk of him gaining access to a phone.  *See* ECF No. 10 at 30.  The magistrate court stated, "the crime here is access to a phone," and "so if the crime that we – the way to keep the community safe is to cut Mr. Brown off from phone access, I don't know that the jail is the best place to put him, because people continually seem to have phone access there."  *Id.*  The magistrate court erred when it failed to consider, as the government argued, that the dangerous posed by the defendant's release was "not simply whether the defendant could get a phone.  This defendant was trying to meet up with a girl, and he was progressing toward that throughout the year that he was exploiting her. And there is very little confidence that the government has that any third-party custodian will keep him from doing that if his mind is set on it, especially when he's living in the townhome community where there are children and minors around." *Id.* at 41.

Second, the defendant in *Willis* sought to present a viable, multi-pronged release plan and submitted a substantial number of supporting materials to the magistrate court.  *See* ECF Nos. 7, 9 & 11 and exhibits thereto, *United States v. Willis*, 22-MJ-122.  No such plan has been presented here, and there are serious questions about the viability—even in the short-term—of the magistrate court's proposed release conditions.  For example, the defendant in *Willis* was released to the custody of both of his parents, who were retired and resided in Michigan at a home they had owned for over 30 years.  That set of circumstances does not exist in this case.  Instead, the defendant's mother will be required to supervise the defendant 24 hours a day, unless she can arrange for her daughter to stand-

in for her.  Furthermore, the proposed residence is not as stable or suitable as in *Willis*.  Here, the proposed third-party custodian is living in a townhouse community with minors and at least one school nearby.

The defendant in *Willis* had also retained a psychologist for a psychosexual evaluation and agreed to begin sex offender treatment, which were incorporated into his release conditions.  The defendant has put forth no such proposal here, and the magistrate court did not order any such conditions.  In *Willis*, there was at least an attempt to assess the defendant's risk and to enroll him in treatment with the goal of rehabilitating him and mitigating his risk to the community.

Because the magistrate court did not adequately consider the nature and circumstances of this offense, or the nature and seriousness of the danger posed to the defendant, but instead relied on cases involving dissimilar conduct, and has proposed release conditions that are inadequate to protect the community, the magistrate court's release order should be reversed.

### B.  A Third-Party Custodian Could Not Assure Community Safety Here.

Given the nature and circumstances of this offense, no third-party custodian could reasonably assure community safety.  In *United States v. Hoppe*, No. 23-CR-102, the defendant traveled to a hotel in Virginia intending to rape an eight-year-old girl.  The defendant sough to be released to home incarceration under the custodianship of her aunt.  Judge Contreras rejected that proposal as wholly inadequate to assure community safety given the nature of the allegations:

> The Court is not convinced that these proposed conditions would reasonably mitigate the risk Defendant's release would pose to the community.  First, it is generally true that, in cases "involving illicit online conduct involving a minor, a defendant cannot establish that an appropriate third-party custodian exists, since, given the ubiquity of internet-capable devices, ensuring against continuing illegal conduct on release often presents insurmountable challenges."  *United States v. Dhavale*, No. 19-mj-92, 2020 WL 1935544, at *5 (D.D.C. Apr. 21, 2020).  That principle applies foursquare here.  Defendant's papers make clear that her proposed third-party custodian has multiple internet-capable devices in her home, including a computer, an iPad, and a cellphone.  *See* Def.'s Suppl. Mot. at 3.  Defendant asserts that these devices would be difficult to access for multiple reasons.  *See id.*  But Defendant does not assert that her aunt

23

would be able to monitor her at all hours of the day. Nor is the Court persuaded that Defendant would be unable to access any other internet-capable devices. Defendant "needs only a hand-held device to access and/or distribute child pornography." *See Galarza*, 2019 WL 2028710, at *6. And because Defendant's aunt cannot provide round-the-clock monitoring, "the absence of such small devices in [Defendant's aunt's] residence cannot be meaningfully verified on a continuous basis." *See id.*

*United States v. Hoppe*, No. 23-CR-102, 2024 WL 1990452, at *6 (D.D.C. May 6, 2024) (Contreras, J.). The same concerns apply here. While the magistrate court ordered that there be no devices inside the rental property and that the defendant's mother use only a flip-phone, the defendant's mother "cannot provide round-the-clock monitoring," and even with occasional home visits, "the absence of such small devices in [the] residence cannot be meaningfully verified on a continuous basis."

Even if a third-party custodian were a viable option in a case such as this, the defendant's mother—although well intentioned—is not an appropriate candidate. The defendant's mother was deemed ineligible by Pretrial to serve as a third-party custodian due to her mental and physical condition. She is 79-years-old, in need of nurse for her daily care, and admits that she is not technologically sophisticated. The defendant's mother has stated that she is willing to go to great lengths—including watching her adult son 24 hours a day—in order to secure the defendant's release from the D.C. Jail. While it is understandable that the defendant's mother wants him home, the burdens she is willing to assume also speak to her lack of distance and objectivity.

Indeed, district courts in this jurisdiction have recognized the challenge faced by third-party custodians—who are essentially being asked to act as correctional officers 24 hours a day for someone about whom they care deeply—and have repeatedly rejected such arrangements as inadequate to reasonably assure community safety. *See, e.g.*, July 24, 2023, Hr'g Tr. 24:14–25, ECF No. 20, *United States v. Gorham*, 23-CR-206 (D.D.C. Aug. 17, 2023) (Berman Jackson, J.) ("I'm concerned that she doesn't have the distance or independence to be his supervisor, and essentially his jailer, after being under U.S. Probation Office supervision while married to her wasn't enough to do

the trick.  And I'm not sure it's appropriate to put her in the position of searching his car every day."); Order at 9, ECF No. 54, *United States v. Cunningham*, 23-CR-7 (D.D.C. Mar. 13, 2023) (Cobb, J.) (same) ("[A] third-party custodian, no matter how competent or dedicated, cannot stand in the shoes of the defendant.  Nor should a third-party custodian be cast in the role of jailer.  To do so is neither realistic nor fair to the custodian. . . . [The defendant's] custodians cannot supervise his behavior on a 24/7 basis."); Order at 14, ECF No. 18, *United States v. Wright*, 22-CR-410 (D.D.C. Dec. 23, 2022) (Cooper, J.) (same) ("But family members are not correctional officers.  Nor should they be expected to play that role"); Order, ECF No. 14, *United States v. Joyner*, 22-CR-252 (D.D.C. Aug. 3, 2022) (McFadden, J.) (same); Order, ECF No. 55, *United States v. Handy*, 22-CR-164 (D.D.C. June 21, 2022) (Walton, J). (same), *aff'd*, Case No. 22-3045 (D.C. Cir.).

And in *Blackson*, then–Chief Judge Howell reversed the magistrate court's release order and discussed the inadequacy of a similar third-party custodian arrangement:

> The proposed conditions impose responsibilities similar to those of full-time and professional employees at detention facilities, but without the benefit of shifts or breaks in service as custodian.  Defendant's mother's capability to uphold those conditions long-term is questionable.  Certainly, the Magistrate Judge attempted to assuage skepticism about the long-term ability of defendant's mother to fulfill all the proposed conditions, and defendant's mother obliged by affirming her willingness and ability to do so.  Regardless of whether defendant's mother is a pillar of the community with ties to local government and law enforcement, she was and has been part of defendant's support community that unsuccessfully kept him out of the court system following his release only last May.  She is currently permitted to work from home for "maybe two or three months for now" and after that, she will have to "see" about her ability to work remotely every day.  Defendant argued that other individuals were approved as third-party custodians to cover gaps in his mother's availability, but that risks inconsistency in the conditions of home incarceration that, as of now, are completely placed on his mother.  To be clear, a benefit of professional detention facilities is the consistency in insuring detention conditions.  Defendant's ability to obtain a fully loaded and unregistered gun while on probation, despite the family support he enjoys, underscores that the best intentions and most valiant efforts of defendant's mother to fulfill all the proposed conditions provide no guarantee these conditions will be maintained to the letter for the duration, possibly many months, of defendant's pretrial proceedings.

*Blackson*, 2023 WL 1778194, at *12 (record citations omitted).

Here, while the government does not challenge the sincerity of the defendant's mother, it does not believe she can serve as viable and plausible third-party custodian.  Her ability to ensure the defendant's compliance with the law is unproven at best.  She also has an obvious personal interest in ensuring that the defendant remains on release.  And she will be required to essentially live under house arrest, able to leave only if her daughter can take time off of work and come to relieve her. This arrangement places an unrealistic burden on the defendant's mother and unacceptably "risks inconsistency in the conditions of home incarceration."  *Blackson*, 2023 WL 1778194, at *12.

## **CONCLUSION**

For the foregoing reasons, the magistrate court erred in setting conditions of release.  Nothing short of detention is adequate to protect the community in this case.  The government respectfully requests that this Court reverse the magistrate court's release order and detain the defendant pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

Dated: June 16, 2025            By:   */s/ Karen L. Shinskie*
                                      Karen L. Shinskie
                                      D.C. Bar No. 1023004
                                      Assistant United States Attorney
                                      United States Attorney's Office
                                      for the District of Columbia
                                      601 D Street NW
                                      Washington, D.C. 20530
                                      (202) 730-6878
                                      karen.sihnskie@usdoj.gov

26